IN THE UNITED STATES DISCTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES GALLAGHER | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| | : | CASE NO.: 18-4914 |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, PENNSYVLANIA | : | |
| STATE POLICE, | : | **JURY TRIAL DEMANDED** |
| PAUL S. GUSTAITIS, | : | |
| CHARLES STASKIEWICZ, | : | |
| THOMAS TRAN, | : | |
| CRYSTAL TURNER-CHILDS, | : | |
| MAYNARD H. GRAY, | : | |
| VINCENT K. D'ANGELO, | : | |
| WILLIAM A. BROWN. | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED CIVIL ACTION COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

### I.    INTRODUCTION

This action has been initiated by James Gallagher (*hereinafter* referred to as "Plaintiff,"

unless indicated otherwise) against the Commonwealth of Pennsylvania, Pennsylvania State

Police, and the above-named Defendants in their individual capacities (referred to as

"Defendants" collectively unless otherwise indicated) for violations of Title VII of the Civil

Rights Act of 1964 ("Title VII - 42 U.S.C. §§ 2000d *et. seq.* - Count I), violations of 42 U.S.C. §

1981 pursuant to 42 U.S.C. § 1983 (Count II), violations of the Equal Protection Clause of the

United States Constitution pursuant to 42 U.S.C. § 1983 (Count III), and for violations of

Plaintiff's First Amendment right to free speech and non-retaliation under the United States

Constitution pursuant to 42 U.S.C. § 1983 (Count IV). As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.[1]

## II.    JURISDICTION AND VENUE

2.    This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States. There lies supplemental jurisdiction over Plaintiff's state-law claims as they arise out of the same common nucleus of operative fact(s) as Plaintiff's federal claims.

3.    This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this Commonwealth and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4.    Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district; and in addition, Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants residents of this venue.

5.    Plaintiff is proceeding herein under Title VII of the Civil Rights Act of 1964 ("Title VII") and has properly exhausted his administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice right to sue letter from the EEOC.

---

[1] Plaintiff also intends to amend his Complaint to add violations of the Pennsylvania Human Relations Act ("PHRA"), as he properly dual filed his EEOC Charge with the Pennsylvania Human Relations Commission. However, his PHRA claims will not be ripe until they have been pending with the PHRC for one (1) full year. Plaintiff's PHRA claims will mirror his Title VII claims.

### III.   **PARTIES**

6.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.      Plaintiff is an adult individual, and is a resident of and has domicile in the County of Berks, Pennsylvania.

8.      The Commonwealth of Pennsylvania (hereinafter "Defendant Commonwealth" if referred to individually), is a sovereign state of the United States of America, with the enabling power and authority to establish entities and departments which serve to operate and manage local and state-wide governmental concerns.

9.      Defendant Pennsylvania State Police (*hereinafter* "PSP") is an agency of Defendant Commonwealth and is a statewide law-enforcement body, dedicated to serving the Commonwealth's citizens, with jurisdiction in all political subdivisions in the Commonwealth; Defendant Pennsylvania State Police includes approximately 4,500 sworn members and an additional approximately 2,000 civilians who serve in a variety of roles.

10.      Defendat Paul S. Gustaitis (*hereinafter* Captain Gustaitis) is a resident of and has domicile in the state of  Pennsylvania; he is a white male and a supervisor and/or decision-maker. For all times related to the causes of action, he was the Commanding Officer of Troop T, the principle decision-maker and made decisions that adversely affected plaintiff's work assignments, career advancements, discipline, times and types of duty performed;   Gustaitis actually participated in the materially adverse actions taken against plaintiff.

11.      Upon information and belief, Captain Gustaitis is a resident of the Eastern District of Pennsylvania (as he lives in West Chester, Chester County PA).

12.     Defendant Charles Staskiewicz (*hereafter* Lieutenant Staskiewicz) is a resident of and has domicile in the state of Pennsylvania; he is a white male supervisor and/or decision-maker.  For all times related to the causes of action, he was the Central Section Commander of Troop T, which covers the Bowmansville Station, PSP; he made decisions that adversely affected plaintiff's work, assignments, career advancements, discipline, times and types of duty performed; Staskiewicz actually participated in the materially adverse actions taken against plaintiff.

13.     Defendant Thomas Tran *(hereafter* Lieutenant Tran) is a resident of and has domicile in the state of Pennsylvania; he is an Asian male supervisor and/or decision-maker. For all times related to the causes of action, he was the EEO Commander for the PSP, which covers the Bowmansville Station, PSP. Tran actively sought to conceal the discrimination and retaliation which was occurring within the PSP and in relation to Plaintiff's own EEO Complaints.

14.     Upon information and belief, Lt. Tran is a resident of and lives in the Eastern District of Pennsylvania (as he lives in Lancaster County, PA).

15.     Defendant Maynard H. Gray (*hereinafter* Major Gray) is a resident of and has domicile in the state of Pennsylvania; he is a white male supervisor and/or decision-maker.  For all times related to the causes of action, he was the Major and was the ultimate authority within the PSP chain of command covering the Bowmansville Station, of the PSP; he made and/or authorized decisions that adversely affected plaintiff's work, assignments, career advancements, discipline, times and types of duty performed.

16.     Defendant Crystal Turner-Childs (*hereafter* Captain Turner-Childs) is a resident of and has domicile in the state of Pennsylvania; she is a black female supervisor and/or

decision-maker. For all times related to the causes of action, she was the adjudicator of Plaintiff's EEO Complaint against Captain Gustaitis, and actively sought to conceal the discrimination and retaliation which was occurring within the PSP and in relation to Plaintiff's own EEO Complaints.

17.     Defendant Vincent K. D'Angelo (*hereafter* Lieutenant Vincent D'Angelo) is a resident of and has domicile in the state of Pennsylvania; for all times related to the causes of action, he was the EEO Liaison, responsible for investigating Plaintiff's EEO Complaint against Captain Gustaitis, and actively sought to conceal the discrimination and retaliation which was occurring within the PSP and in relation to Plaintiff's own EEO Complaints.

18.     Upon information and belief Lt. D'Angelo is a resident of and lives in the Eastern District of Pennsylvania (as he lives in Berks County, PA).

19.     Defendant William A. Brown (*hereinafter* Captain Brown) is a resident of and has domicile in the state of Pennsylvania; for all times related to the causes of action, he was responsible for investigating Plaintiff's EEO Complaints against Captain Gustaitis, and actively sought to conceal the discrimination and retaliation which was occurring within the PSP and in relation to Plaintiff's own EEO Complaints.

## **FACTUAL BACKGROUND**

20.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

21.     Plaintiff is an adult East Asian/Korean male (whose race is *hereinafter* referred to as "Asian").

22.     In or about 1995, Plaintiff graduated from the PA State Police Academy and was assigned to Troop K, Media as a Trooper.

23.     On or about March 7, 2009, Plaintiff was promoted to Corporal while assigned to the Bureau of Integrity and Professional Standards.

24.     On or about November 7, 2015, Plaintiff transferred from Troop L Reading Station to Troop T, Everett Station.

25.     On or about May 23, 2016, Plaintiff transferred from the Everett Station to the Bowmansville Station.

26.     During all relevant times thereafter, Plaintiff's listed work address and contact information within his email signatory was as follows:

Corporal James P. Gallagher | Patrol Unit Supervisor
Pennsylvania State Police | Troop T, Bowmansville
443 Panorama Drive | Denver, PA 17517

27.     Plaintiff's immediate supervisor was Sergeant David R. Holt, a black male. Sergeant Holt has been assigned to Troop T since 2011 and is the only black Station Commander in the State of Pennsylvania.

28.     At all relevant times alleged in this Complaint, Sergeant David R. Holt's listed work address and contact information within his email signatory was as follows:

Sergeant David R. Holt II, Station Commander
Pennsylvania State Police | Troop T, Bowmansville
443 Panorama Drive, Denver, PA. 17517

29.     Sergeant Holt's immediate supervisor was Lieutenant Charles Staskiewicz, a white male. Lieutenant Staskiewicz had been assigned to Troop T since March 2017.

30.     The Plaintiff is the only Asian Corporal assigned to Troop T.

31.     As a Corporal assigned to Troop T for the Bowmansville station, and at all relevant times outlined *herein*, Plaintiff rarely appeared at Highspire (PSP Headquarters located in Harrisburg).

32.    In fact, Plaintiff has and may appear at Highspire for meetings, relative to his duties as the Construction Zone Coordinator, at most 2-3 times per year.  The incidents outlined *herein* primarily occurred at the Bowmansville station, or involved Plaintiff's communications through email or phone.

33.    On July 29, 2017, Sergeant Holt assigned Plaintiff as the Construction Zone Coordinator at the Bowmansville Station. The Construction Zone Coordinator function is to assign Construction Zone (CZ) Overtime (OT) to Troopers, Corporals and Sergeants in a fair and equitable manner as per PSP Policy.

34.    In Troop T, there are eight (8) Construction Zone Coordinators, seven (7) white males and the Plaintiff. PSP Policy indicates PSP members may receive 400 hours of discretionary overtime hours in a calendar year, "*excluding*" holidays (Christmas, Thanksgiving etc.) and operational Patrol/Criminal related incidents.[2]

35.    On October 20, 2017, Lieutenant Staskiewicz, visited the Bowmansville Station. Once there, Lieutenant Staskiewicz began to arbitrarily question the Plaintiff about Construction Zone (CZ) procedures. Lieutenant Staskiewicz then questioned the Plaintiff about the CZ OT hours specifically accumulated by three (3) minorities, Trooper Ronald Charles a black male, Ricardo Linan a Hispanic male and the Plaintiff.

36.    On October 23, 2017, Lieutenant Staskiewicz telephoned Sergeant Holt and began to interrogate him about the number of CZ OT hours accumulated by the Plaintiff.   Sergeant  Holt subsequently provided  the information as requested to  Lieutenant Staskiewicz.

---

[2] As an additional point, overtime *beyond* 400 hours may be granted to PSP members by the Trooper Command, as same is within the Troop Command's discretion.

37.    After the interrogation, Sergeant Holt notified Lieutenant Staskiewicz that the Plaintiff was operating within the auspice of PSP policy pertaining to the CZ OT distribution and contractual guidelines.  Sergeant Holt also notified Lieutenant Staskiewicz the Plaintiff was not doing *"anything differently"* than the Plaintiff's similarly situated white peer Construction Zone Coordinators. Sergeant Holt then questioned *"why"* the Plaintiff was being *"singled out"* and if the Plaintiff's similarly situated white peers were also being scrutinized in the same manner.

38.    Plaintiff believes and avers Lieutenant Staskiewicz knew the number of CZ OT hours already accumulated by the Plaintiff, as bi-weekly OT Reports were routinely provided from Clerical Staff within Troop T and he also had access to same electronically. Furthermore, Lieutenant Staskiewicz had access to and had received these reports since his assignment in March 2017.

39.    On November 8, 2017, while attending a meeting at Troop T Headquarters (in full duty uniform), Plaintiff encountered Captain Gustaitis in a hallway.  By custom, practice and per para-military courtesy, Plaintiff acknowledged Captain Gustaitis, stating "Sir". Captain Gustaitis looked directly at the Plaintiff; however, failed to acknowledge or respond to the Plaintiff via the same custom, practice and para military courtesy. At the conclusion of the meeting, while in the proximity of Captain Gustaitis' office, Plaintiff encountered Captain Gustaitis again. Captain Gustaitis again failed to acknowledge Plaintiff's presence.

40.    On November 28, 2017, Sergeant Holt received an email from Lieutenant Staskiewicz relating the Plaintiff was being "benched" (restricted from receiving CZ OT monies) and was not permitted to work anymore. This was done without explanation.

41.     Sergeant Holt questioned Lieutenant Staskiewicz "*why*" the Plaintiff was being "*benched*." Lieutenant Staskiewicz responded the Plaintiff "should be happy" with the hours already accumulated.

42.     Plaintiff, as ordered is "benched" from receiving any additional CZ OT monies; however, his similarly situated white peers are not.

43.     Plaintiff avers and believes the stipulations of being "*benched*" and the pretext reason proffered, was not conveyed to, or enforced against any other Construction Zone Coordinators within Troop T, as all other Construction Zone Coordinators were white males, one of which was a Sergeant at the Everett station.

44.     On December 1, 2017, at the Plaintiff's request, Sergeant Holt sent an email to Captain Gustaitis inquiring "who" was       the       decision       maker       to       "*bench*"       the Plaintiff from receiving any more CZ OT monies without explanation.

45.     Captain Gustaitis did not respond to Sergeant Holt via email; however, he did call via telephone.

46.     Captain Gustaitis immediately began to challenge Sergeant Holt if he (Sergeant Holt) had a problem with the Plaintiff scheduling his own CZ OT hours, to which Sergeant Holt replied "no". Captain Gustaitis then questioned Sergeant Holt if he thought the Plaintiff was "intimidating" Troopers into "not "signing up for CZ OT, so as to personally receive more CZ OT monies for himself, to which Sergeant Holt replied "no". Captain Gustaitis then advised Sergeant Holt that he (Captain Gustaitis) believed the Plaintiff "could not be trusted" to fairly and equitably distribute CZ OT hours.

47.     Sergeant Holt subsequently advised Captain Gustaitis that his biased beliefs had no foundation, as there were no complaints received or grievances filed by members of the

Bowmansville Station to warrant the Plaintiff's *"benching"* and accusations. Sergeant Holt also advised Captain Gustaitis the Plaintiff was doing a *"good job"* managing and distributing CZ OT and it was being done in a fair and equitable manner.

48.     Plaintiff believes and avers Captain Gustaitis did not call and challenge any other white Sergeants within Troop T, make inquiries about their assigned white Construction Zone Coordinators, nor make similar false accusations made against the Plaintiff or require them to be replaced. Captain Gustaitis was fully aware the other Construction Zone Coordinators were white males and were similarly situated as the Plaintiff.

49.     Plaintiff further believes and avers, the specific assertion by Captain Gustaitis of "intimidating Troopers" into not signing up for CZ OT was not conveyed to, or asked of Sergeant Dennis Guelich from the Everett Station, as he too was a Construction Zone Coordinator. Sergeant Guelich was of a higher rank, had control over and wrote Troopers daily/weekly schedules and scheduled CZ OT for himself.

50.     On December 2, 2017, Plaintiff filed an internal EEO Complaint against Captain Gustaitis for illegal Discrimination/Disparate Treatment.

51.     On December 3, 2017, Plaintiff received confirmation from Assistant EEO Director, Lieutenant Thomas Tran.

52.     On December 4, 2017, Lieutenant Tran requested Plaintiff to telephone him in reference to his filed EEO Complaint. Plaintiff telephones Lieutenant Tran who then attempts to *"persuade"* the Plaintiff not to follow through with his complaint against Captain Gustaitis. Plaintiff refused.

53.     Plaintiff believes and avers Lieutenant Tran made this request to protect the PSP, and Captain Gustaitis, as he is a high-ranking officer and to intimidate the Plaintiff.

54.     On December 5, 2017, Sergeant Holt sent an email to Lieutenant Staskiewicz, Lieutenant Gary Dance (Eastern Section Commander), Captain Gustaitis, Captain Michael Witmer, Director EEO, Major Maynard Gray (Captain Gustaitis' supervisor) and to the Plaintiff outlining what he deemed to be illegal Discriminatory conduct taken against the Plaintiff by Captain Gustaitis.

55.     None of the aforementioned individuals within Sergeant Holt's Chain of Command respond to his *"Clarion Call."*

56.     On December 7, 2017, due to the non-response, Sergeant Holt sent another email to the aforementioned individuals, providing additional examples of inequitable treatment taken against the Bowmansville Station and Plaintiff by Captain Gustaitis.

57.     December 7, 2017, Plaintiff was advised by Sergeant Holt he was *"ordered"* not to send any additional emails to Captain Gustaitis or Major Gray regarding the Discriminatory conduct, even though PSP Policy (Administrative Regulations 1-1 C1.1 and 4-26 Discrimination) permits same.

58.     On December 7, 2017, Plaintiff learned Captain Witmer responded to Sergeant Holt and stated he (Captain Witmer) initiated an EEO inquiry on Sergeant Holt's behalf based on the content of his (Sergeant Holt's) email.

59.     Plaintiff believes and avers, Captain Witmer responded as the information provided by Sergeant Holt was true and correct.

60.     On December 7, 2017, Plaintiff learned Major Gray initiated an Internal Affairs Investigation against Sergeant Holt alleging his email communique to Captain Gustaitis was insubordinate and Conduct Unbecoming an Officer. These inflated charges were subsequently "unfounded" and adjudicated by a fellow Captain.

61.     On December 7, 2017, Plaintiff is advised his EEO Complaint is assigned to EEO Liaison, Lieutenant Vincent D'Angelo.

62.     At all relevant times D'Angelo was an EEO Liaison assigned to PSP's Reading barracks, located in Berks County.

63.     On about December 8, 2017, Plaintiff filed an online complaint with the U.S. Equal Employment Opportunity Commission.

64.     On December 19, 2017, Plaintiff was interviewed by Lieutenant D'Angelo for approximately three (3) hours regarding his EEO Complaint. Lieutenant D'Angelo's questions are accusatory and make Plaintiff feel as if the investigation is an attempt to "exonerate vs. investigate" the illegal discriminatory conduct taken against him by Captain Gustaitis.

65.     This December 19, 2017 interview occurred at the Bowmansville station.

66.     On or about January 11, 2018 Plaintiff learned Sergeant Holt emailed Acting Commissioner Robert Evanchick and advised him of the Discriminatory conduct of Captain Gustaitis and that Major Gray was complicit.

67.     In or about January, 2018, Plaintiff learned Lieutenant D'Angelo broadens his scope of interviews that included individuals who were not similarly situated as the Plaintiff (Construction Zone Coordinators); ultimately compiling/completing a 748-page report.

68.     On February 20, 2018, Lieutenant D'Angelo again interviewed the Plaintiff. The interview questions were again accusatory, became verbally combative and made the Plaintiff feel as if the investigation was an attempt to "exonerate vs. investigate" the illegal discriminatory conduct taken against him by Lieutenant Staskiewicz and Captain Gustaitis.

69.     This interview also occurred at the Bowmansville station.

70.     During the interview, Plaintiff learned Sergeant Guelich had accumulated over 290 hours of OT, which is un-common for a Sergeant Construction Zone Coordinator. Same should have been readily identified by Lieutenant Staskiewicz and Captain Gustaitis, as Sergeants have control over and wrote Troopers daily/weekly schedules, which can easily be manipulated to intimidate Troopers and Corporals, which the Plaintiff was accused of, but not authority to do.

71.     D'Angelo also performed additional interviews in relation to Plaintiff's EEO Complaint at the Bowmansville station, including the interviews of Sgt. Holt, and Corporal Todd Cessna.

72.     March 30, 2018, the Commonwealth received correspondence from the EEOC regarding Plaintiff's complaint.

73.     Shortly after engaging in protected EEO Complaints, Captain Gustaitis and Lieutenant Staskiewicz arbitrarily reduced the amount of "manpower" Plaintiff was permitted to utilize at his barracks, and arbitrarily demanded that Plaintiff and others at his barracks work straight time for several CZ projects (which was atypical and deprived Plaintiff and his Troopers of overtime opportunities).

74.     Under normal circumstances, Plaintiff would have minimum staffing of 4 Troopers and 1 Corporal; however, Command abruptly restricted Plaintiff's manpower to 3 Troopers and 1 Corporal shortly following his EEO Complaints.

75.     As an action of further retaliation, Command consolidated Bowmansville's work zones, and implemented directives forcing the Plaintiff and the Troopers at his Bowmansville barracks to pull "double duty," perform more arduous tasks, and forcing them to simultaneously

attempt to maintain the safety for the construction zone workers while also handling crashes and routine patrol calls.

76.     In or about February of 2018, Captain Gustaitis retired.

77.     Shortly after Captain Gustaitis' retirement, Lieutenant Staskiewicz made a direct statement conceding that the sudden reduction of overtime and reduction of manpower at the Bowmansville station (implemented shortly after Plaintiff's EEO complaints) was completely arbitrary – as Lt. Staskiewicz said "now things can go back to the way they were before" (as he was being only being complicit in Captain Gustaitis' retaliatory actions).

78.     On May 7, 2018, Lieutenant D'Angelo completed his report and submitted same to Lieutenant Tran for review and adjudication.

79.     On June 26, 2018, *"prior"* to the PSP's EEO making a determination of fact, the PSP's Office of Chief Counsel responded to the EEOC via their Position Statement indicating *"Cpl. Gallagher has presented no evidence that the PSP has in any way retaliated against him, and the practices and guidelines put in place at Cpl. Gallagher's station put the station in compliance with practices and procedures followed by other stations in Troop T, to ensure fair allotment of discretionary overtime hours and compliance with the 400 hour cap."*

80.     PSP's response was rich, as no official policy existed within Troop T, referencing the practices and guidelines or practices and procedures touted.  Furthermore, PSP states, *"all this incident amounts to is Cpl. Gallagher's overreaction to managements reasonable guideline and practices in place to ensure compliance with the 400-hour cap on discretionary overtime."*  If true, the PSP will need to account for the numerous individuals within PSP who have accrued *"well over"* the 400-hour OT stated cap.

81.     On July 6, 2018, approximately two (2) months after being in receipt of Lieutenant D'Angelo's report, Plaintiff received a determination of finding from *"newly promoted"* EEO Director, Captain William Brown. Captain Brown dismissed the Plaintiff's complaint indicating there was "insufficient evidence." Captain Brown referenced Governor's Management Directive 410.10 in his communique to Plaintiff.

82.     Plaintiff avers and believes, newly promoted Captain Brown lacks the requisite qualifications, training in EEO matters and or Title VII laws. Furthermore, as noted on June 26, 2018, the PSP Office of Chief Counsel already made the decision for Captain Brown.

83.     On July 6, Captain Brown, advised Plaintiff he may appeal the collaborative decision to dismiss Plaintiff's complaint to Captain Chrystal Turner-Childs (Black Female) Commanding Officer of Troop L, Reading. PSP's Office of Chief Counsel was aware of Captain Brown's communique to Plaintiff.

84.     On about July 9, 2018, Plaintiff filed an appeal with Captain Chrystal Turner-Childs, per newly promoted Captain Brown's communique.

85.     On July 12, 2018, three (3) business days after receiving Plaintiff's appeal and allegedly reviewing a *"748-page"* EEO investigative report, Captain Turner-Childs with the knowledge and concurrence of the PSP's Office of Chief Counsel, dismissed Plaintiff's Complaint. Captain Turner-Childs indicated there was "insufficient evidence" to show Plaintiff was the victim of illegal Discrimination. Captain Turner Childs also references Governor's Management Directive 410.10 in her communique to Plaintiff.

86.     Plaintiff avers and believes, Captain Turner Childs lacks the requisite qualifications, training in EEO matters and or Title VII laws. Furthermore, as noted on June 26, 2018, the PSP Office of Chief Counsel already made the decision for Captain Turner Childs.

87.     Plaintiff also believes it highly improbable Captain Turner Childs reviewed the 748-page report thoroughly and was instructed by the PSP's Office of Chief counsel (per policy) to dismiss the Plaintiff's complaint.

88.     Captain Turner Childs advised Plaintiff he may appeal her decision to the Governor's Office of Administration, Bureau of Equal Employment Office (BEEO). PSP's Office of Chief Counsel was aware of Captain Turner Childs communique to Plaintiff.

89.     On or about July 25, 2018, Plaintiff filed an appeal with Governor's Office of Administration, BEEO.

90.     On August 22, 2018, Plaintiff was contacted by Mrs. Eline Hower and Mrs. Liz Martinec from the Governor's Office of Administration, BEEO, wherein a conference call was held about the Plaintiff's appeal.  Plaintiff was advised his complaint had not merit, as *"Captain Gustaitis did not know you were Korean."*

91.     On September 10, 2018, Plaintiff received correspondence from the Governor's Office of Administration, BEEO, indicating the Plaintiff's complaint *"must be transferred to the agency counsel who will direct all further investigation and or handling of the matter."*

92.     As noted, Captain Turner-Childs referenced Management Directive 410.10 in the communique to the Plaintiff, as did Captain Brown.  Captain Turner Childs knew Plaintiff could not appeal her decision as per Management Directive 410.10, or didn't know, showing her incompetence and lack of requisite training.

93.     Plaintiff exhausted administrative remedies before initiating this civil action. The EEOC issued a right to sue letter, and this action is commenced within 90 days of the date the plaintiff received the EEOC right to sue letter.

**Count I**
**Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**(Against Defendant Commonwealth and Defendant PSP only)**
**(Racial Discrimination & Retaliation)**

94.     The foregoing paragraphs are incorporated *herein* by reference as if set forth in full.

95.     As aforementioned, Plaintiff was denied overtime opportunities because of his race.

96.     Once Plaintiff purposed EEO Complaints, he was subject to various materially adverse actions which would dissuade any reasonable person from pursuing a complaint of discrimination; in particular, the PSP's command reduced the manpower available to the Bowmansville barracks, thereby making Plaintiff's job duties more arduous and depriving him of the requisite Troops/personnel to adequately run the barracks.

97.     In addition, following his EEO Complaints, PSP Command implemented arbitrary policies resulting in significantly less overtime opportunities at the Bowmansville barracks.

**Count II**
**Violations of 42 U.S.C. § 1981 ("Section 1981")[3] pursuant to Section 1983**
**(Against Defendants in their individual capacities only)**
**(Racial Discrimination & Retaliation)**

98.     Plaintiff reasserts and realleges each and every allegation as set forth in Count I, as such racially and retaliatory conduct would also constitute violations of Section 1981.

99.     Individual Defendants Captain Gustaitis, Lieutenant Staskiewicz, and Major Gray were all personally involved in making the decision to deprive Plaintiff of overtime opportunities based upon his race from November of 2017 through December of 2017, and were all subsequently directly involved in taking actions in concert to reduce the manpower allotted for

---

[3] Korea is in Eastern Asia. Eastern Asians are a recognized race. "East Asians" are a recognized race. See Koehler v. Infosys Techs. Ltd. Inc., 107 F. Supp. 3d 940, 946 (E.D. Wis. 2015); see also Short v. Mando Am. Corp., 805 F. Supp. 2d 1246, 1270 (M.D. Ala. 2011)(denying motion to dismiss explaining that Asian or Korean sufficiently constituted race under §1981 under the facts of the case); Kim v. Dial Serv. Int'l, 96 CIV. 3327 (DLC), 1997 U.S. Dist. LEXIS 66, at *11 (S.D.N.Y. Jan. 7, 1997)(denying motion to dismiss where employee contended he was discriminated against under §1981 because of his "Korean race").

Plaintiff's Bowmansville barracks (resulting in more arduous tasks as aforementioned), and directing Plaintiff and his Troopers to only work straight time and deprive them of overtime opportunities solely due to Plaintiff's EEO Complaints.

100.    All Individual Defendants took affirmative acts to conceal the discriminatory and retaliatory behavior brought to their attention by purposely failing to adhere to EEO investigative policies and procedures, refusing to perform a thorough and non-biased investigation and by encouraging and condoning the acts of discriminatory/retaliatory conduct.

**Count III**
**Violations of the Equal protection Clause**
**of the Fourteenth Amendment through § 1983**
**(Against Defendants in their individual capacities only)**
**(Racial Discrimination & Retaliation)**

101.    Plaintiff reasserts and realleges each and every allegation as set forth in Counts I-I, as such racially and retaliatory conduct would also constitute violations of the Equal Protection Clause.

102.    Individual Defendants Captain Gustaitis, Lieutenant Staskiewicz, and Major Gray were all personally involved in making the decision to deprive Plaintiff of overtime opportunities based upon his race from November of 2017 through December of 2017, and were all subsequently directly involved in taking materially adverse actions in concert to reduce the manpower allotted for Plaintiff's Bowmansville barracks (resulting in more arduous tasks as aforementioned), and directing Plaintiff and his Troopers to only work straight time and deprive them of overtime opportunities shortly after and solely due to Plaintiff's EEO Complaints.

103.    All Individual Defendants took affirmative acts to conceal the discriminatory and retaliatory behavior brought to their attention by purposely failing to adhere to EEO investigative

policies and procedures, refusing to perform a thorough and non-biased investigation and by encouraging and condoning the acts of discriminatory/retaliatory conduct.

**Count IV**
**First Amendment Retaliation pursuant to Section 1983**
**(Against Defendants in their individual capacities only)**
**(Retaliation)**

104.    Plaintiff reasserts and realleges each and every allegation as set forth in Counts I-I, as such racially and retaliatory conduct would also constitute violations of the Equal Protection Clause.

105.    Individual Defendants Captain Gustaitis, Lieutenant Staskiewicz, and Major Gray were all personally involved in taking materially adverse actions in concert to reduce the manpower allotted for Plaintiff's Bowmansville barracks (resulting in more arduous tasks as aforementioned), and directing Plaintiff and his Troopers to only work straight time and deprive them of overtime opportunities shortly after and solely due to Plaintiff's EEO Complaints.

106.    All Individual Defendants took affirmative acts to conceal the discriminatory and retaliatory behavior brought to their attention by purposely failing to adhere to EEO investigative policies and procedures, refusing to perform a thorough and non-biased investigation and by encouraging and condoning the acts of discriminatory/retaliatory conduct.

107.    Plaintiff engaged in numerous incidents of protected activities under the First Amendment, including but not limited to:

   i.)      expressing complaints of discrimination and retaliation internally and externally about and concerning Defendants[4]

---

[4] *See e.g. Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005)(reversing district court's grant of summary judgment explaining any concerns of discrimination in a workplace are protected speech under the First Amendment and a matter of public concern).

ii.) Filing Charges of Discrimination and Retaliation with the Equal Employment Opportunity Commission ("EEOC") and PHRC, federal and state agencies;

iii.) Filing internal grievances with the PSP regarding discriminatory and retaliatory/practices existent within the PSP;

108. Plaintiff engaged in numerous activities and complaints of public speech, in the capacity of a private citizen, about and concerning matters of public concern, and Defendants had no justification for subjecting Plaintiff to a hostile work environment and undertaking many discrete and non-discrete adverse actions towards him as set forth explicitly and implicitly throughout this lawsuit

109. Despite knowledge of his protected conduct, each of the individually named Defendants participated in decisions thereafter either to create a retaliatory hostile work environment or to deny Plaintiff advancement opportunities in the forms of promotions, training opportunities, and/or issued negative formal evaluations.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to promulgate and adhere to a policy prohibiting harassment, discrimination and retaliation in the future against any employee(s);

B. Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, emotional distress and humiliation caused by Defendants' actions;

C. Plaintiff is to be awarded punitive damages against the individual defendants were permitted by applicable law in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious, and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.      Plaintiff is to be awarded damages for all benefit denials, loss of income, loss of overtime access, loss of training, loss of opportunities, harm to his reputation, and for injury to his career due to false and pretextual admonishment of him, and for other harms as permitted by law;

E.      Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate;

F.      Plaintiff is to be awarded the costs and expenses of this action and a reasonable attorney's fees as provided by applicable federal and state law; and

G.      Plaintiff is to receive a trial by jury.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:

Ari R. Karpf, Esq.
Christine E. Burke, Esq.
3331 Street Road
Two Greenwood Square
Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: March 12, 2019